IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PATRICIA BRITO,
*Plaintiff*,

v.

Civil Action No. ELH-20-0230

MAJOR ENERGY ELECTRIC
SERVICES, LLC,
*Defendant*.

**MEMORANDUM OPINION**

In this putative class action, plaintiff Patricia Brito has sued defendant Major Energy Electric Services, LLC ("Major" or "Major Energy"), an electricity provider. ECF 1. The suit concerns Major's methods of soliciting and acquiring new residential customers as well as the rates Major charges for electricity.

In an "Amended Class Action Complaint" (ECF 20, the "Amended Complaint"), Ms. Brito asserts four counts, each founded on Maryland law and lodged on behalf of a putative class and a putative subclass. Count I alleges violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code (2013 Repl. Vol.), § 13-101 *et seq.* of the Commercial Law Article ("C.L."). ECF 20, ¶ 45. In Count II, plaintiff alleges unjust enrichment. *Id.* ¶ 59. Count III lodges a claim for "Common Law Fraud, Including Fraudulent Inducement, and Fraudulent Concealment." *Id.* ¶ 64. And, in Count IV, plaintiff asserts negligent misrepresentation. *Id.* ¶ 72.

The Amended Complaints asserts subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). *Id.* ¶ 9. Plaintiff seeks class certification as well as declaratory relief, disgorgement, compensatory and actual damages, attorney's fees, and costs. *Id.* ¶ 82.

Major has moved to dismiss (ECF 21), supported by a memorandum of law.  ECF 21-1 (collectively, the "Motion to Dismiss").  Defendant asserts that dismissal is warranted for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), and for improper venue, pursuant to Rule 12(b)(3).  According to Major, the Court lacks subject matter jurisdiction because Brito has not exhausted her administrative remedies with the Maryland Public Service Commission (the "Commission" or "PSC").  ECF 21 at 2.  And, Major contends that venue is improper because Brito is bound by the arbitration clause in her contract with Major.  ECF 21-1 at 18.  In addition, Major opposes class certification and argues that all of plaintiff's claims fail under Rule 12(b)(6). *Id.* at 2.  The Motion to Dismiss is supported by exhibits.  ECF 21-2.

Defendant has also filed a motion to stay or to dismiss plaintiff's suit, pursuant to § 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3.  ECF 22.  The motion is supported by a memorandum of law.  ECF 22-1 (collectively, the "FAA Motion").  The exhibits supporting the FAA Motion are identical to those appended to the Motion to Dismiss.  *See* ECF 22-2.

Plaintiff opposes the Motion to Dismiss (ECF 31) and the FAA Motion (ECF 30) (collectively, the "Opposition").  Defendant has replied to both submissions.  *See* ECF 32 (Reply in support of the Motion to Dismiss; ECF 33 (Reply in support of the FAA Motion).

Ms. Brito has also moved for leave to file two surreplies.  ECF 34.  The proposed surreply supporting her opposition to the Motion to Dismiss is docketed at ECF 34-1.  The proposed surreply supporting plaintiff's opposition to the FAA Motion is docketed at ECF 34-2. The two proposed surreplies are virtually identical, and each is accompanied by plaintiff's Declaration. *See* ECF 34-1 at 7; ECF 34-2 at 7.

The motions are fully briefed and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant defendant's Motion to Dismiss, grant defendant's FAA Motion, and deny plaintiff's motion for leave to file a surreply.

## I.  Background

### A.

Maryland is one of several states that has deregulated the market for electricity.  ECF 20, ¶ 2; ECF 21-1 at 10; *see* Md. Code (2020 Repl. Vol.), §§ 7-501 to 7-516 of the Public Utilities Article ("P.U.") (subtitle on "Electric Industry Restructuring").[1]  Before deregulation, local utilities sold and delivered electricity to consumers.  *See* ECF 21-1 at 10.  Deregulation enabled "[r]etail energy suppliers [to] sell directly to consumers, using the local utility's distribution system to deliver electricity."  *How it Works*, MD ELECTRIC CHOICE, https://www.mdelectricchoice.com/how-it-worrks/ (last accessed December 13, 2020).[2]  As a result of deregulation, residential consumers may now elect to purchase electricity from a supplier other than their local utility.  *Id.*  However, suppliers must be licensed by the Commission.  *Electric Choice, Frequently Asked Questions*, MARYLAND PUBLIC SERVICE COMMISSION, https://www.psc.state.md.us/electricchoice/frequently-asked-questions/ (last accessed December 13, 2020).

According to the Commission's website, if a consumer chooses an electricity supplier other than his/her local utility, the consumer "may be able to receive a single monthly bill from [her] utility that details the retail electricity supplier's charges separately."  *Id.*  The website also

---

[1] The Court may take judicial notice of "adjudicative facts" pursuant to Fed. R. Evid. 201.

[2] http://www.mdelectricchoice.com is the Commission's "Official Shopping Website."  *Id.*

indicates that "[s]ome retail electricity suppliers have the ability to bill you separately." *Id.*  But, the website does not specify which suppliers have the ability to do so.  *See id.*

During the relevant period, Ms. Brito was a resident of Baltimore.  ECF 20,      ¶ 24.  She alleges that Major, a New York corporation, sells electricity to consumers in Maryland, New York, Pennsylvania, New Jersey, Illinois, Massachusetts, Connecticut, Ohio and Washington, D.C., "through a network of both Major Energy's internal employees and external third-party vendors," which the Complaint refers to as "sales representatives."  *Id.* ¶¶ 3, 7.  According to plaintiff, Major's sales representatives are paid by commission and "use standardized marketing and training materials to carry out door-to-door and telephone solicitations, in-person solicitations at retail establishments, and direct mail and online advertisements in an effort to switch consumers to Major."  *Id.* ¶ 4.

The core of the suit concerns how Major solicits and acquires new customers, and what it charges for electricity.  Ms. Brito alleges, *id.* ¶ 1:

> Major Energy obtains many of its customers without even gaining their actual agreement or authorization to switch to its electrical services, a practice known as "slamming." Second, it falsely promises lower electric bills compared to what consumers currently pay their electric provider but then places much higher charges on the bill, a practice known as "cramming."

Further, plaintiff alleges that in February 2017, a Major sales representative conducting a door-to-door marketing campaign arrived at her doorstep.  *Id.* ¶ 25.  The sales representative asked plaintiff "if he could see her Baltimore Gas and Electric bill, which is a routine practice asked to all potential Major Energy customers.  Plaintiff agreed to let him look at it."  *Id.* ¶ 26.[3]  The sales

---

[3] Baltimore Gas and Electric Company, a subsidiary of Exelon Corporation, is a local utility provider.  *See About Us*, BGE, https://www.bge.com/AboutUs (last accessed January 7, 2021).

representative then "represented to Plaintiff that her electric bill would be lower each month if she switched to Major Energy." *Id.* ¶ 27.

Ms. Brito asserts that she "never signed any door-to-door sales agreement and never actually gave consent to switching her electricity provider." *Id.* ¶ 28. But, she adds: "After the Major Energy sale's representative left Plaintiff's residence, Major Energy switched Plaintiff's electric from Baltimore Gas & Electric to Major Energy." *Id.*

Plaintiff did not notice any changes in her electricity bill "for a period of many months." *Id.* ¶ 29. According to plaintiff, her bill "appeared substantially the same as before the switch and she did not notice the small, inconspicuous notation that Major Energy was now her designated provider." *Id.* Moreover, "her monthly charges were not immediately excessive." *Id.* However, she alleges: "At some point after the switch to Major Energy, Plaintiff's electric costs were significantly higher than what they were for Baltimore Gas & Electric for the same historical electrical usage that Plaintiff usually utilized." *Id.* ¶ 30.

According to Ms. Brito, her experience is part of Major's "fraudulent scheme," which affects consumers "everywhere that Major Energy offer its services." *Id.* ¶ 31. There are two main components to this scheme: "slamming" and "cramming." *Id.* ¶ 1. As to the former, plaintiff asserts, *id.* ¶ 5:

> Major Energy's sales representatives always ask consumers to see their utility bills, often under false pretenses, and copy down the information. Frequently, the sales representatives simply switched many customer's [sic] without consent. Major Energy created a system that incentives [sic] document forgery and creates practical barriers for consumers to know that they have been slammed . . . .

Moreover, Major "does not have a workable policy or practice to ensure that an agreement to switch providers is authentic." *Id.* ¶ 18.

However, Ms. Brito adds that even where Major acquires new customers with consent, Major engages in unlawful cramming.  *Id.* ¶¶ 5, 18.  Plaintiff asserts, *id.* ¶ 18:

> Upon information and belief, Major Energy . . . trains . . . "sales representatives" through substantively uniform selling scripts and other marketing materials to lure consumers to switch from their current electric company to Major Energy, with the false promise that they will receive lower competitive rates resulting in savings in their monthly bills.

According to plaintiff, Major's website is also implicated in its "deceptive marketing practices."  *Id.* ¶ 21.  The Amended Complaint includes two images allegedly taken from majorenergy.com.  One image displays text that states: "You do have a choice in who supplies your electricity…PROTECT YOURSELF HERE!  Get a Low Fixed Rate on Your Utility Bills. All Year.  Guaranteed."  *Id.* (capitalization and emphasis in original).  The other image contains the words: "Take the fear out of rising utility rates…GET ONE LOW RATE FOR 12 MONTHS!" *Id.* (capitalization in original).  Plaintiff avers that these advertisements resulted in "unlawful cramming by falsely promising consumers energy rates and savings which Major Energy knowingly fails to deliver."  *Id.* ¶ 18.

In sum, Ms. Brito avers, *id.* ¶ 34:

> 34.  Major Energy's misrepresentations and omissions caused injury to [p]laintiff and the members of the Class because they were either unlawfully slammed and/or unjustifiably induced to believe that they would receive energy costs savings on their monthly bills when, in actuality, Plaintiff and Class members were charged substantially more for their energy needs after Major Energy switched to its services.

The Amended Complaint defines the putative "National Class" as follows, *id.* ¶ 37:

> All persons who are or have been Major Energy customers in New York, Pennsylvania, Maryland, New Jersey, Illinois, Massachusetts, Connecticut, Ohio and Washington DC and any other locations where Major Energy markets its services who used Major Energy as their electricity supplier.

And, the Amended Complaint defines the putative "Maryland subclass" as: "All persons who are or have been Major Energy customers in Maryland who used Major Energy as their electricity supplier." *Id.*

**B.**

Major tells a different story.[4]  It submitted a Declaration of the Chief Operating Officer for Spark Energy Inc., Kevin McMinn.  ECF 21-2 at 2-6; ECF 22-2 at 2-6 (collectively, the "McMinn Declaration" or "Declaration").[5]  According to the Declaration, McMinn has access to Major's records, which are maintained in the regular course of business.  *Id.* at 2, ¶ 2.

McMinn avers that in February 2017, Major contracted with third-party salespersons "to conduct door-to-door solicitations" in Baltimore and other locations.  *Id.* at 3, ¶ 8.  Major provided the salespersons with "training materials . . . to ensure compliance with all applicable state laws and regulations."  *Id.*

A salesperson solicited Ms. Brito at her residence on or about February 1, 2017.  *Id.* at 4, ¶ 9.  The Declaration states the following about that solicitation, *id.* at 4, ¶ 10:

> Following a sales representative's solicitation of a customer, it was standard procedure for that sales representative to notify Major Energy of the solicitation and relevant information regarding the customer, including his or her name, address, and current electricity account information. Thereafter, Major Energy, in accordance with its standard procedures for confirming the enrollment of new customers, would mail enrollment letters and its Terms & Conditions to the customers who were solicited by the sales representatives.

---

[4] As discussed, *infra*, given the nature of Major's pending motions, the Court may consider the evidence presented, in addition to the pleadings.

[5] Identical copies of the Declaration are appended to the Motion to Dismiss and to the FAA Motion.  For convenience, I shall cite to ECF 21-2.

7

In accordance with that procedure, Major subsequently mailed an "Enrollment Letter" to Ms. Brito at her residence.  *Id.* at 4, ¶ 11.  According to McMinn, nothing in Major's records indicates that the letter was returned to sender as undeliverable.  *Id.* at 4, ¶ 13.

A copy of the Enrollment Letter is included with the Declaration.  *See id.* at 8. The Enrollment Letter, which is not dated, begins: "Dear Patricia Brito . . . Welcome to Major Energy . . . . We wanted to take a moment to let you know about some of the terrific benefits and advantages of being our customer."  *Id.*  It also states, *id.*:

> Your Price Protection Plan for Electric at 0.1317/kWh is now locked in for the next 12 Months no matter how hot, cold or extreme the weather gets.  Additionally, please keep in mind that you are not leaving Baltimore Gas And Electric Company. They will still service and deliver your energy and continue to . . . send you bills.

According to the Declaration, a copy of Major's "Terms & Conditions" (ECF 21-2 at 10-11, also referred to as the "Agreement") accompanied the Enrollment Letter.  *Id.* at 4, ¶ 12. Paragraph 1 of the Terms & Conditions states that the document constitutes an agreement between the customer and Major to sell and purchase electricity.  *Id.* at 10, ¶ 1.  Paragraph 7, titled "Cancellation," provides: "A residential Customer may rescind this Agreement within 3 business days after the signing or receipt of this Agreement, whichever comes first, by contacting Major . . . ."  *Id.* at 10, ¶ 7.

Paragraph 14, the Agreement's dispute resolution provision, provides, in relevant part, *id.* at 11, ¶ 14 (capitalization in original; internal boldface added):

> **14. Dispute Resolution.** In the event of a billing dispute or a disagreement involving Major's service hereunder, the parties will use their best efforts to resolve the dispute.  Customer should contact Major by telephone or in writing as provided above.  The dispute or complaint relating to a residential customer may be submitted by either party at any time to the Maryland PSC's Office of External Relations . . . .  **Any claim by customer (except for a claim challenging the validity or enforceability of this arbitration clause, including the Class Action Waiver) must be resolved by the PSC or arbitration.** THIS MEANS YOU SHALL NOT HAVE THE RIGHT TO LITIGATE SUCH CLAIM IN COURT OR TO HAVE A JURY TRIAL. ALSO DISCOVERY AND APPEAL RIGHTS ARE

LIMITED IN ARBITRATION. Class Action Waiver – ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS YOU MAY NOT JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION OR LITIGATE IN COURT AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

McMinn avers that plaintiff never contacted Major to rescind the Agreement. *Id.* at 5, ¶ 16. Months later, Major mailed Ms. Brito a "Renewal Letter," dated December 16, 2017. *Id.* at 5, ¶ 18. Nothing in Major's records indicates that the letter was returned to sender as undeliverable. *Id.*

A copy of the Renewal Letter is included with the Declaration. ECF 21-2 at 13. The letter, addressed to Ms. Brito, begins: "Thank you for being a loyal customer of Major Energy . . . ." *Id.* Further, it sets forth information about "new variable rate pricing" and provides that the "variable rate contract" may be terminated without penalty. *Id.* A set of "Terms & Conditions" identical to those that accompanied the Enrollment Letter were included with the Renewal Letter. *See id.* at 13-14.

McMinn asserts that plaintiff did not contact Major in response to the Renewal Letter. *Id.* at 6, ¶ 22. Therefore, plaintiff's account with Major was terminated on January 15, 2019. *Id.* at 6, ¶ 23. Nothing in Major's records indicates that plaintiff filed an inquiry or grievance with the Commission regarding the allegations in the Amended Complaint. *Id.* ¶ 24.

## II.  Motion for Surreplies

At the outset, I address Ms. Brito's motion for leave to file two surreplies.

Local Rule 105.2(a) provides that a party is not permitted to file a surreply without permission of the court. Although the filing of a surreply "is within the Court's discretion, *see* Local Rule 105.2(a), ... they are generally disfavored." *EEOC v. Freeman*, 961 F.Supp.2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g., Chubb & Son v. C & C Complete Servs., LLC*, 919 F.Supp.2d 666, 679 (D. Md. 2013). However, a surreply may be

permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply. *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F.Supp.3d 519, 529 (D. Md. 2014) (quotations and citations omitted). Conversely, a surreply is generally not permitted where the reply is merely responsive to an issue raised in the opposition. *See Khoury v. Meserve*, 268 F.Supp.2d 600, 605-06 (D. Md. 2003).

Ms. Brito asserts that Major raised "several new arguments" for the first time in its replies. ECF 34 at 1. But, the only purportedly new argument that she actually identifies is Major's contention that plaintiff failed to present any evidence in her Opposition regarding the existence of an arbitration agreement. *Id.*

Plaintiff is attempting to recast defendant's characterization of plaintiff's Opposition as a new argument. The Court is not persuaded. Major presented all of its substantive arguments regarding arbitration, along with the evidence supporting those arguments, in its Motion to Dismiss and in the FAA Motion. Defendant's observation in its replies that plaintiff did not include any evidence in her Opposition does not rise to the level of argument that warrants the filing of a surreply.

Accordingly, I shall deny plaintiff's motion for leave to file surreplies.[6]

### III. Arbitration

As noted, Major has moved to dismiss or stay the suit on several grounds, including a lack of subject matter jurisdiction. Major does not challenge plaintiff's assertion of subject matter jurisdiction pursuant to CAFA, 28 U.S.C. § 1332(d)(2). Rather, defendant contends that subject

---

[6] Although I shall deny the motion for leave to file surreplies, I refer to the content, *infra*.

matter jurisdiction is lacking because plaintiff has failed to exhaust her administrative remedies with the Commission.  *See* ECF 21-1 at 15.

In support of its position, Major cites *McCoy v. Pepco Holdings, Inc.*, GJH-15-2487, 2016 WL 8678000, at *2 (D. Md. June 10, 2016), which stated: "Motions to dismiss for failure to exhaust administrative remedies are governed by [Federal Rule of Civil Procedure] 12(b)(1) for lack of subject matter jurisdiction." (quoting *Clarke v. DynCorp Int'l LLC,* 962 F. Supp. 2d 781, 786 (D. Md. 2013)) (brackets in *Clarke*).  However, neither *Clarke* nor the case on which it relied, *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003), concerned exhaustion arguments pertaining to the Commission.  Rather, they were employment discrimination cases and involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.  Clarke*, 962 F. Supp. 2d at 784; *Khoury*, 268 F. Supp. 2d at 603.

Notably, the Supreme Court recently held that a plaintiff's failure to exhaust administrative remedies does not divest the court of jurisdiction over Title VII claims.  *Fort Bend Cty v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846 (2019).  Rather, exhaustion is a "claim-processing rule," and it is "'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'"  *Id.* (cleaned up) (quoting *Eberhart v. United States*, 546 U.S. 12, 19, 126 S.Ct. 403 (2005) (per curiam)).  Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6), rather than Rule 12(b)(1).  *See Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Davis*).

There must be an "independent jurisdictional basis" for suit in federal court. *Hall St. Assocs., LLC v. Mattel*, *Inc.*, 552 U.S. 576, 581-82 (2008).  For example, "diversity jurisdiction would authorize a federal court to resolve disputes concerning the arbitration process. . . ."

*McCormick v Am. Online, Inc.*, 909 F.3d 677, 681 (4th Cir. 2018). Here, it is not entirely clear whether Major's exhaustion argument is in fact jurisdictional or, instead, whether it is cognizable under Rule 12(b)(6).

Ordinarily, a court first addresses challenges to subject matter jurisdiction. "[B]efore a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). A federal district court may only adjudicate a case if it possesses the "'power authorized by Constitution and statute.'" *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2007) (citation omitted).

Under the circumstances of this case, however, I turn first to Major's FAA Motion and its motion under Rule 12(b)(3), which concern the enforceability of the Agreement's arbitration clause. If Ms. Brito is bound by the arbitration clause, as Major contends, then she may only bring her claims in the PSC or in arbitration—not in court. *See* 21-2 at 11, ¶ 14. In other words, the Court would be unable to adjudicate Ms. Brito's suit, regardless of whether she exhausted her administrated remedies.

### A. Legal Standards

#### 1. The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

Major moves to dismiss or stay this action pursuant to 9 U.S.C. § 3. Enacted in 1925, the FAA "requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, ___ U.S. ___, 139 S. Ct. 1407, 1412 (2019); *see McCormick*, 909 F.3d at 679 (the FAA "provides for the enforceability of arbitration agreements and specifies procedures for conducting arbitrations and enforcing arbitration awards").

Under § 2 of the FAA, an arbitration contract is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Thus, the FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, ___ U.S. ___, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also McCormick*, 909 F.3d at 680 ("[T]he FAA elevates the arbitration of claims as a favored alternative to litigation when the parties agree in writing to arbitration.").

Section 3 of the FAA provides, 9 U.S.C. § 3:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Thus, the Fourth Circuit has said: "The FAA requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.' This stay-of-litigation provision is mandatory." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting 9 U.S.C. § 3)). Nevertheless, in lieu of a stay, some courts have determined that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *see Willcock v. My Goodness! Games, Inc.*, PWG-16-4020, 2018 WL 3970474, at *4 (D. Md. Aug. 20, 2018); *Kabba v. Ctr.*, PWG-17-211, 2017 WL 1508829, at *2 (D. Md. Apr. 27, 2017) (same), *aff'd*, 730 F. App'x 141 (4th Cir. 2018).

Under 9 U.S.C. § 4, a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a district court "for an order

directing that such arbitration proceed in the manner provided for in such agreement."  Further, §
4 provides that, when presented with such a petition, a court

> shall hear the parties, and upon being satisfied that the making of the agreement for
> arbitration . . . is not in issue, the court shall make an order directing the parties to
> proceed to arbitration in accordance with the terms of the agreement.

Conversely, § 4 provides that if the "making of the arbitration agreement . . . be in issue," then
"the court shall proceed summarily to the trial thereof."

"'Sections 3 and 4 [of the FAA] ... provide two parallel devices for enforcing an arbitration
agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3,
and an affirmative order to engage in arbitration, § 4.'"  *Galloway v. Santander Consumer USA,
Inc.*, 819 F.3d 79, 84 (4th Cir. 2016) (quoting *Chorley Enters. v. Dickey's Barbecue Rests., Inc.*,
807 F.3d 553, 563 (4th Cir. 2015) (brackets in *Galloway*).  Here, Major has moved for a stay or
dismissal, pursuant to § 3; it has not moved to compel arbitration under § 4.  ECF 22-1 at 7.

"Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: '[A]
party cannot be required to submit to arbitration any dispute which he has not agreed so to
submit.'"  *Levin v. Alms and Assoc., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (quoting *Am. Recovery
Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 92 (4th Cir. 1996) (citation omitted))
(alteration in *Levin*); *see Berkeley v. Hub Int'l Ltd.*, 944 F.3d 225, 236 (4th Cir. 2019); *Minnieland
Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 913 F.3d 409, 415
(4th Cir. 2019).  And, "where the dispute at issue concerns contract formation, the dispute is
generally for courts to decide."  *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287,
296 (2010); *see also Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d at 234 (4th Cir. 2019)
(stating that § 4 of the FAA "requires that the district court—rather than the arbitrator—decide
whether the parties have formed an agreement to arbitrate"); *Snowden v. CheckPoint Check*

*Cashing*, 290 F.3d 631, 637 (4th Cir. 2002). However, the Supreme Court has said "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ___ U.S. ___, 139 S. Ct. 524, 529 (2019) (internal quotation marks omitted).

In sum, the Fourth Circuit has stated, *Galloway*, 819 F.3d at 84 (cleaned up) (citations omitted):

> [A]pplication of the FAA requires demonstration of four elements: (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

*See also Adkins*, 303 F.3d at 500-01; *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). And, these requirements apply to motions brought under § 3 as well those brought under § 4 of the FAA. *See Noe v. City Nat'l Bank of W. Virginia*, 828 F. App'x 163, 165 (4th Cir. 2020) (citing *Adkins*, 303 F.3d at 500-01).

The *Adkins* Court also said, 303 F.3d at 500: "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." Accordingly, a court must "engage in a limited review to ensure that the dispute is arbitrable—*i.e.*, that a valid agreement exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002).

To determine if there is a valid agreement, courts in the Fourth Circuit "'apply ordinary state-law principles that govern the formation of contracts and the federal substantive law of arbitrability.'" *Minnieland Private Day Sch.*, 913 F.3d at 415 (citation omitted). Notably, "[a]ny uncertainty regarding the scope of arbitrable issues agreed to by the parties must be resolved in

15

favor of arbitration." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citations

omitted); *see also Levin*, 634 F.3d at 266 ("The 'heavy presumption of arbitrability requires that

when the scope of the arbitration clause is open to question, a court must decide the question in

favor of arbitration.'"); *Adkins*, 303 F.3d at 50.

### 2.  Rule 12(b)(3)

The Supreme Court has observed that an arbitration clause is "a specialized kind of forum-

selection clause that posits not only the situs of suit but also the procedure to be used in resolving

the dispute."  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974).  In *Sucampo*

*Pharmaceuticals, Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006), the Fourth

Circuit determined that "a motion to dismiss based on a forum-selection clause," such as an

arbitration provision, "should be properly treated under Rule 12(b)(3) as a motion to dismiss on

the basis of improper venue."  The *Sucampo* Court explained, *id* at 548 (internal and external

citations omitted) (my alteration):

> [T]reating a motion to dismiss on the basis of a forum-selection clause under Rule
> 12(b)(1) presents practical difficulties that undercut the benefits gained from
> enforcement of the clauses.  For example, the court must raise the issue of subject-
> matter jurisdiction *sua sponte*, if necessary.  *See* Fed. R. Civ. P. 12(h)(3).  Thus, in
> cases involving forum-selection clauses, both district and circuit courts would be
> under an obligation to confirm that the clause was not applicable before reaching
> the merits of the action. . . .  More importantly a motion to dismiss under Rule
> 12(b)(1) is non-waivable and may be brought at any time—even on appeal—
> regardless of whether a litigant raised the issue in an initial pleading.  Litigants,
> therefore, could hold back forum-selection clause objections, until after
> discovery—or even an adverse verdict.

Moreover, the Fourth Circuit has recognized that Rule 12(b)(6) "is not the appropriate

motion for enforcing a forum-selection clause."  *Sucampo*, 471 F.3d at 549.  It explained that

"because a 12(b)(6) motion may be brought at any time prior to adjudication on the merits,

analyzing forum-selection clauses under Rule 12(b)(6) would present some of the same timing

concerns as in the 12(b)(1) context."  *Id*. (citations omitted).  The Court reasoned: "Analyzing

forum-selection agreements under Rule 12(b)(3) would avoid the doctrinal and timing disadvantages of utilizing Rule 12(b)(1) or (6) and be consistent with Supreme Court precedent." *Id.* (citing *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998) (finding that motions to dismiss based on forum-selection clause should be analyzed under Rule 12(b)(3) based on the Supreme Court's decision in *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988))).

Since *Sucampo*, the Fourth Circuit has reiterated that a challenge based on a forum-selection clause, including an arbitration clause, should be addressed by way of a motion to dismiss for improper venue under Rule 12(b)(3).  *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012).  Nevertheless, other judges of this court have considered motions to dismiss in favor of arbitration under Rule 12(b)(1) and Rule 12(b)(6).  *See, e.g., Willcock*, 2018 WL 3970474, *3 (D. Md. Aug. 20, 2018) (collecting cases); *Garrett v. Monterey Fin. Servs., LLC*, JKB-18-325, 2018 WL 3579856, at *2 (D. Md. July 25, 2018) ("[M]otions to dismiss in connection with a valid arbitration agreement are often brought under Rule 12(b)(6) based on the observation that the existence of a valid arbitration clause does not technically deprive the Court of subject matter jurisdiction. . . . However, courts have also found it proper to dismiss claims subject to arbitration agreements under Rule 12(b)(1)." (citations omitted)); *Lomax v. Weinstock, Friedman & Friedman, P.A.*, CCB-13-1442, 2014 WL 176779, at *2 (D. Md. Jan. 15, 2014) ("Courts have found it proper to dismiss claims subject to arbitration agreements under both Rule 12(b)(1) and Rule 12(b)(6)."), *aff'd*, 583 F. App'x 100 (4th Cir. 2014).

In this case, Major has moved to dismiss, pursuant to Rule 12(b)(3).[7]  In the Fourth Circuit, when a challenge to venue is raised under this rule, the plaintiff bears the burden of demonstrating

---

[7] Major does not rely on ¶ 15 of the Agreement, titled "Choice of Laws," which provides: "Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms hereof shall lie exclusively in the State of New York."  ECF 21-1 at 11.

that venue is appropriate. *Bartholomew v. Va. Chiropractors Ass'n,* 612 F.2d 812, 816 (4th Cir. 1979), *cert. denied*, 446 U.S. 938 (1980), *overruled on other grounds by Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982); *accord Tinoco v. Thesis Painting, Inc.*, GJH-16-752, 2017 WL 52554, at *2 (D. Md. Jan. 3, 2017); *Jones v. Koons Auto. Inc.,* 752 F. Supp. 2d 670, 679 (D. Md. 2010).  If the court does not hold an evidentiary hearing, "the plaintiff need only make a prima facie showing that venue is proper." *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 732 (D. Md. 2017) (citing *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)).  "In assessing whether there has been a prima facie venue showing, [the court views] the facts in the light most favorable to the plaintiff." *Aggarao*, 675 F.3d at 366.  And, the court may "freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550; *see also Aggarao*, 675 F.3d at 365-56 ("On a motion to dismiss under Rule 12(b)(3), a court is permitted to consider evidence outside the pleadings."); *Taylor v. Shreeji Swami, Inc.*, PWG-16-3787, 2017 WL 1832206, at *1 (D. Md. May 8, 2017) (same); *Convergence Mgmt. Assocs., Inc. v. Callender*, TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (same).

Because "'it is possible for venue to be proper in more than one judicial district,' the question is not whether a given district is the best venue, but whether the events or omissions that occurred there are 'sufficiently substantial.'" *Carefirst*, 235 F. Supp. 3d at 732 (quoting *Mitrano*, 377 F.3d at 405).  And, in considering "whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Mirtano*, 377 F.3d at 406 (citation omitted).  Instead, "it should review 'the entire sequence of events underlying the claim.'" *Id.*; *accord Taylor*, 2017 WL 1832206, at *1; *Callender*, 2016 WL 6662253, at *2.

---

As indicated, a motion to dismiss for improper venue, filed under Rule 12(b)(3), "allows the court to freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550. Here, the Court considers the exhibits submitted by Major: the McMinn Declaration (ECF 21-2 at 2-6); the Enrollment Letter (*id.* at 8); the Agreement (*id.* at 10-11); and the Renewal Letter (*id.* at 13).

### B.  Choice of Law

"[I]nterpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004). Because federal courts exercising diversity jurisdiction "apply the choice of law rules of the forum state," I must consult the choice of law rules of Maryland, the state in which this Court is situated, to determine which state's substantive law applies to questions concerning contract formation in this case. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)); *see also Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) ("When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state.").

When a contract contains a choice of law provision, Maryland courts apply § 187(2) of the *Restatement (Second) of Conflict of Laws* (1971) ("Restatement"), which states: "The law of the state chosen by the parties to govern their contractual rights will be applied." *See Ace American Ins. Co. v. Grand Banks Yachts, Ltd.*, 587 F. Supp. 2d 697, 704 (D. Md. 2008) (applying Restatement § 187(2)). Notwithstanding this general rule, "[i]n Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial

relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp.*, 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 921 A.2d 799, 803-05 (2011)); *see Restatement* § 187.

The parties appear to agree that Maryland law controls, albeit for different reasons. Major points to the Agreement's choice of law clause. *See, e.g.*, ECF 21-1 at 20. Paragraph 15 of the Agreement provides: "This Agreement shall be construed under and shall be governed by the laws of the State of Maryland without regard to the application of its conflicts of law principles." ECF 21-2 at 11. Ms. Brito maintains that the Agreement is unenforceable and does not rely on its choice of law clause. But, she does not dispute that Maryland law controls with respect to the issue of arbitrability. Moreover, she relies on Maryland law to support her position that the Amended Complaint's four counts are not subject to dismissal for failure to state a claim. ECF 31 at 21-33. Therefore, the Court will apply Maryland law to determine the enforceability of the arbitration provision. *See Berkeley Cty. Sch. Dist.*, 944 F.3d at 236 (applying state law agreed upon by parties in deciding arbitration issues); *Galloway*, 819 F.3d at 85 (same).

## C. Analysis

As noted, application of the FAA requires, *inter alia*, a dispute between the parties. Clearly, there is such a dispute here. *See* ECF 22-1 at 8; ECF 30 at 2. Thus, the first element required for the application of the FAA is satisfied. *See Galloway*, 819 F.3d at 84.

The parties disagree as to the second element: whether there exists an enforceable "written agreement that includes an arbitration provision which purports to cover the dispute." *Id.* Major contends that the Agreement is an enforceable contract and that its arbitration clause precludes

Ms. Brito from litigating her claims in this Court.  ECF 21-1 at 18; ECF 22-1 at 1.  Conversely, Ms. Brito is firmly of the view that she is not bound by the arbitration clause, or by the Agreement at all, because no contract was formed between her and Major.  In this regard, she asserts that she "never consented to Major Energy as her service provider," ECF 31 at 19, and therefore "no agreement exists."  ECF 30 at 3.

In the Amended Complaint Ms. Brito alleges that Major wrongfully acquired new residential customers in two ways.  In particular, plaintiff claims that Major "unlawfully slammed" some customers, that is, enrolled them in its services without consent, and with others, Major allegedly obtained their consent, but "unjustifiably induced [them] to believe that they would receive energy costs savings on their monthly bills."  ECF 20, ¶ 34.  In plaintiff's Opposition, however, she argues, as noted, that she is not bound by the Agreement's arbitration clause because she never consented to receive Major's services, and thus no contract was ever formed.  *See* ECF 30 at 3-4; ECF 31 at 18-2.  She does not advance the alternative theory that a contract was created between Major and plaintiff, but that it is unenforceable as to plaintiff because she was fraudulently induced to enter into it.

Neither party addresses the distinction in these arguments.   But, the distinction is significant.  The Supreme Court has explained that the "question of whether an arbitration agreement was 'ever concluded'"—that is, formed—is generally not arbitrable, whereas "the question whether a contract containing an arbitration clause was illegal when formed" may be "arbitrable in certain circumstances."  *Granite Rock*, 561 U.S. at 296 (quoting *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444 n. 1 (2006)).  Here, Ms. Brito's opposition raises a question as to the former category.

Maryland law governs on the issue of whether a contract was formed, as mentioned.[8] In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990); *accord* RESTATEMENT (SECOND) CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in

---

[8] Neither party has addressed whether the questions of contract law in this case are governed by the Maryland Uniform Commercial Code ("UCC"), which "applies to transactions in goods." *See* Md. Code, C.L. §§ 2-102, 2-105(1). It appears that the Maryland courts have not directly spoken to this issue. The Maryland Court of Appeals has held that "electricity which remains in a utility company's distribution system is not a good within . . . Maryland's UCC." *Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*, 79 Md. App. 461, 471–72, 558 A.2d 419, 424 (1989). However, the *Singer* Court did not address "whether electricity becomes a good when it is processed into a more marketable state." *Gorin v. Vivint Solar Developer LLC*, SAG-19-1207, 2019 WL 4735412, at *3 (D. Md. Sept. 27, 2019). Absent an instruction from the Maryland courts to apply the UCC to electricity, I shall apply common law contract principles here.

writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)).   Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement.   *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974).   If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable.   *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ."   *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)).   "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms."   *Cochran*, 398 Md. at 14, 919 A.2d at 708.   "Importantly, acceptance may be manifested by actions as well as words."   *Galloway*, 819 F.3d at 87 (citing *Porter v. General Boiler Casing Co.*, 284 Md. 402, 396 A.2d 1090, 1095 (1979) ("The purpose of a signature is to demonstrate 'mutuality or assent' which could as well be shown by the conduct of the parties.")); *see also* Restatement (Second) of

Contracts § 53(1) ("An offer can be accepted by the rendering of a performance only if the offer invites such acceptance.").

Major does not concede that Ms. Brito did not consent to enroll with Major during the solicitation at her residence. ECF 22-1 at 9. But, it argues that even if Ms. Brito did not consent to become a Major customer during her interaction with the Major salesperson, as she alleges, a contract was nevertheless formed over the days or weeks that followed.

In defendant's view, the question of contract formation here does not turn on what happened on February 1, 2017. Rather, according to Major, the material facts are that plaintiff presumptively received the Enrollment Letter and the Agreement in early 2017, followed by the Renewal Letter and the Agreement in late 2017. And, it was not until 2019 that plaintiff contacted Major to cancel her service with Major and otherwise inform Major that she did not want to be a Major customer. In the interim, plaintiff received, accepted, and paid for electricity from Major. *See* ECF 21-1 at 20-23; ECF 22-1 at 13-14.

In sum, Major argues that plaintiff received a proposed contract and effectively accepted or assented to it by her conduct; she benefited from and paid for Major's services. ECF 21-1 at 24; ECF 22-1 at 15. Under these facts, Major contends that a contract was formed under Maryland law.

Defendant argues correctly that the McMinn Declaration establishes a presumption that Ms. Brito received both the Enrollment Letter and the Renewal Letter at her residence, each of which included a copy of the Agreement. In the Declaration, McMinn avers that both letters were mailed to plaintiff's residence and that neither was returned to sender as undeliverable. ECF 21-2 at 4-5, ¶¶ 13, 18.

"It is an established rule of evidence that the testimony of a witness that he properly addressed, stamped and mailed a letter raises a presumption that it reached its destination at the regular time and was received by the person to whom it was addressed." *Kolker v. Biggs*, 203 Md. 137, 144, 99 A.2d 743, 746 (1953); *see also Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385 Md. 99, 115, 867 A.2d 1026, 1035 (2005) (citing *Kolker* to support proposition that if an insurer demonstrates that it mailed a particular kind of notice to an insured by certified mail, then the insurer "enjoys a presumption that the notice actually arrived"); *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884) ("The rule is well settled that if a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed, from the known course of business in the post-office department, that it reached its destination at the regular time, and was received by the person to whom it was addressed.") (citing British and State court decisions).[9]

In her Opposition, plaintiff does not directly challenge either the evidence or the case law cited by Major to establish the presumption of receipt. Thus, Ms. Brito has not rebutted the presumption that she received the Enrollment Letter or the Renewal Letter, along with the Agreement. As noted, plaintiff takes a different tack in her Opposition, insisting that a contract was never formed because she never consented to become Major's customer, notwithstanding

---

[9] Although Major properly relies on *Kolker*, 203 Md. at 144, 99 A.2d at 746, it incorrectly labels the principle articulated therein as the "mailbox rule." ECF 21-1 at 21. The common law mailbox rule, which Maryland follows, instructs that "'the mailed acceptance of an offer is effective when mailed, not when received or acknowledged.'" *U.S. Life Ins. Co. in City of New York v. Wilson*, 198 Md. App. 452, 477, 18 A.3d 110, 124 (2011) (citation omitted). In other words, the rule determines when an offer was accepted and, by extension, when a contract was formed. In contrast, *Kolker* merely establishes when evidence of dispatch establishes a presumption of receipt. Moreover, the mailbox rule concerns circumstances where an acceptance was communicated by mail, rather than by conduct or silence, as is relevant here.

Major's evidence demonstrating that she received the Agreement and benefited from Major's services for approximately two years.

Plaintiff attempted to change course with her proposed surreplies.  Her Declaration, appended to both proposed surreplies, states: "I do not recall ever receiving the Terms & Conditions, the Enrollment Letter, or the Renewal Letter . . . .  If these had been mailed to me, I would have considered them junk mail and I would have thrown them out unopened with all the other junk mail, including junk mail solicitations from other energy providers."  ECF 34-1 at 8, ¶ 9.  However, I do not consider this Declaration as evidence, because I have resolved to deny plaintiff's motion for leave to file surreplies.  And, in any event, the proposed surreplies do not discuss the legal implications of plaintiff's averment that if the documents had been mailed to her, she would have "considered them junk mail" and discarded them.

As indicated, Major also contends that a contract was formed when Ms. Brito paid for and benefited from Major's provision of electricity, after twice receiving the Agreement in the mail. Major notes that the Agreement provides that a customer may rescind the Agreement within three business days of receiving or signing it by contacting Major, which plaintiff did not do.  *See* ECF 21-2 at 10, ¶ 7.  For that reason alone, Major asserts, the Agreement took effect.  *See* ECF 21-1 at 23; ECF 22-1 at 12.  Moreover, Major underscores that under well settled principles of Maryland contract law, plaintiff's payment for and receipt of electricity from Major for nearly two years constitutes acceptance of the Agreement.

Defendant asserts that, under Maryland law, "[a]cceptance can be accomplished by acts as well as words; no formal acceptance is required. . . .  Notification of acceptance is not essential to the formation of a contract."  *Porter*, 284 Md. 409-10, 396 A.2d at 1094; *see* ECF 21-1 at 24; ECF 22-1 at 13.  In support of its position, defendant also cites *Att'y Grievance Comm'n of Md. v.*

*Donnelly*, 458 Md. 237, 283, 182 A.3d 743, 769 (2018), in which the Maryland Court of Appeals said: "A person accepts an offer of services through silence where the person knows the terms on which the services are offered, receives the benefit of the services, and does not reject the offer despite having a reasonable opportunity to do so." *See* ECF 21-1 at 24; ECF 22-1 at 13.

Major also draws on three cases from other jurisdictions to support its contention that a contract was formed here. Each case involved a consumer who affirmatively contacted or initiated a transaction with a vendor or service provider, whereas Ms. Brito was solicited by Major. Despite this distinction, the cases are informative.

In *Wold v. Dell Fin. Servs., L.P.*, 598 F. Supp. 2d 984, 985-87 (D. Minn. 2009), plaintiff Eric Wold applied by phone for financing for the purchase of a computer. The defendant lender employed its standard practice of mailing a credit agreement, along with a "Welcome Package," to consumers who applied for financing by phone. *Id.* The credit agreement contained an arbitration clause. *Id*. Thereafter, Wold sued the lender for alleged "violation of the Fair Credit Reporting Act[] and credit defamation." *Id.* at 986. The lender sought to compel arbitration. Wold opposed, arguing that he never received the credit agreement and therefore no arbitration agreement was formed. *Id.* Applying Utah law, the court determined that an enforceable arbitration agreement had been formed because the defendant established an unrebutted presumption that Wold received the credit agreement in the mail and because Wold paid off his debt. *Id.* at 987. Moreover, the court noted: "Courts routinely enforce so-called 'shrinkwrap' accept-or-return arbitration agreements." *Id.* at 987 (citing, *inter alia*, *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148-49 (7th Cir. 1997)).

*Hill*, 105 F.3d at 1147, also arose from a purchase of a computer by phone, followed by the shipment of the computer in the mail along with a list of terms, including an arbitration clause.

The plaintiffs sued, alleging the computer was defective.  In an opinion by Judge Easterbrook, the Seventh Circuit held that the arbitration clause was enforceable.  *Id.* The court noted that "[a] contract need not be read to be effective," and that the formation of a contract in those circumstances merely required "the opportunity" for the customer to read the terms and return the product.  *Id.*  As to the practice of sending a proposed contract along with the purchased product, the court reasoned: "'A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance.'"  *Id.* at 1149 (citation omitted).

Major also cites *Vernon v. Quest Communication International, Inc.*, 857 F. Supp. 2d 1135 (D. Colo. 2012).  The case primarily concerned whether existing customers of an internet service provider were sufficiently put on notice of the terms of a new agreement to govern their services.  *See id.* at 1150-51.  Applying Colorado law, the court concluded that the customers' assent to the new agreement could be "gleaned from the totality of the circumstances."  *Id.* at 1150.  Of relevance here, the court noted that the fact that some of the plaintiffs continued using the service for several months after receiving a "Welcome Letter" was evidence of their manifestation of assent.  *Id.* at 1152.

As indicated, the cases on which Major relies involve circumstances that differ from those present in this case.  *See*, *e.g.*, *Donnelly*, 458 Md. at 283, 182 A.3d at 769 (discussing the formation of an attorney-client relationship via correspondence); *Porter*, 284 Md. 414-15, 396 A.2d at 1097 (discussing the formation of a contract between an employer and a union, reasoning that the employer's conduct, including its contribution to fringe benefits for union members and communication with union officials, "manifested its intention to be bound by" an unsigned contract).  For example, both *Wold*, 598 F. Supp. 2d 984, and *Hill*, 105 F.3d at 1147, offer analyses

of contract formation and the enforceability of arbitration agreements in circumstances where a customer received a contract after electing to initiate a purchase.

Plaintiff does not cite any pertinent Maryland case law regarding contract formation. Rather, she cites cases applying the law of other jurisdictions for the general proposition that an arbitration agreement is unenforceable if one party never assented to the agreement or a contact was otherwise not formed.  *See Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31-32 (2d Cir. 2001) (stating that the issue of arbitrability may be litigated if evidence is produced showing that the purported contract is void); *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992) (stating that issues concerning "the making" of an arbitration agreement are for a district court to decide), *abrogated on other grounds by Larsen v. Citibank FSB*, 871 F.3d 1295, 1303 (11th Cir. 2017); *Matter of Arbitration Between Nuclear Elec. Ins. Ltd. (Cent. Power & Light Co.)*, 926 F. Supp. 428, 434 (S.D.N.Y. 1996) ("Where, however, a party claims that it never actually manifested assent to a contract containing an agreement to arbitrate . . . that party cannot be forced to arbitrate . . . ."); *Dougherty v. Mieczkowski*, 661 F. Supp. 267, 274 (D. Del. 1987) ("[I]f no contract exists, there is no right to arbitration.").

The principles of Maryland law regarding contract formation are capacious enough to shed light on the facts of this case.  "[A] manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract."  *Cochran*, 398 Md. at 14, 919 A.2d at 708.  Generally, "[s]ilence is . . .  not to be considered an acceptance of an offer."  *Id.* at 23–24, 919 A.2d at 714. But, as Major asserts, one can manifest assent through conduct and even, at times, through silence. This proposition is firmly established in Maryland case law.  *See Donnelly*, 458 Md. at 283, 182 A.3d at 769; *Cochran*, 398 Md. at 23–24, 919 A.2d at 714; *Porter*, 284 Md. at 411, 396 A.2d at

1095; *Chesapeake, Etc. v. Manitowoc,* 232 Md. 555, 567, 194 A.2d 624, 630 (1963); *Duplex Envelope Co. v. Balto. Post Co.,* 163 Md. 596, 605, 163 A. 688, 691 (1933)).

To illustrate, silence may be deemed an acceptance if "the parties had agreed previously that silence would be an acceptance, the offeree has taken the benefit of the offer, or because of previous dealings between the parties, it is reasonable that the offeree should notify the offeror if she does not intend to accept." *Cochran*, 398 Md. at 23-24, 919 A.2d at 714 (citing, *inter alia,* Restatement (Second) of Contracts § 69); *see also Kropfelder v. Snap-On Tools Corp.*, 859 F. Supp. 952, 955 (D. Md. 1994) (concluding that payment for and acceptance of benefits after the expiration of a contract reflected "an intent to continue the terms of the prior contract"). The Fourth Circuit has explained that this rule "is a consequence of the doctrine of equitable estoppel." *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 440 (4th Cir. 2001) (citing *Ganley v. G & W Ltd. Partnership*, 44 Md. App. 568, 409 A.2d 761, 764 (1980)).

Applying these principles to the facts here compels the conclusion that Ms. Brito accepted the Agreement when, by her own admission, she learned that Major was supplying her with electricity and yet she took no action in response for an undue period. Indeed, it is undisputed that plaintiff took the benefits of Major's electricity services for a period of nearly two years, without objection. Although plaintiff asserts that she did not knowingly take those benefits, she does not rebut the presumption that she was put on notice of the change in her electricity supplier through her receipt of the Agreement in the mail, together with the Enrollment Letter and the Renewal Letter.

Moreover, plaintiff's own averments in the Amended Complaint undercut her contention that she never agreed to become a customer of Major. Ms. Brito alleges: "For a period of many months, Plaintiff did not notice any change in her electric bill because it appeared substantially the

same as before the switch and she did not notice the small, inconspicuous notation that Major Energy was now her designated provider and because her monthly charges were not immediately excessive." ECF 20, ¶ 29.  Although this allegation is light on detail, it nevertheless indicates that, "many months" after February 1, 2017, plaintiff learned, through her electric bill, that Major was her electricity supplier.  Tellingly, plaintiff does not go on to allege that after that discovery, she contacted Major to terminate her service.

Major has submitted evidence that plaintiff's account was terminated on January 15, 2019. ECF 21-2 at 6, ¶ 23.  But, in her Opposition, plaintiff does not address how this evidence relates to her pleading.  She does not assert, for instance, that she discovered that Major was her supplier in late 2018 or early 2019 and soon after terminated her account.  Given the particular facts of this case, taken from plaintiff's allegations and defendant's evidence, the principle regarding acceptance articulated in *Donnelly*, 458 Md. at 283, 182 A.3d at 769, neatly applies here.  Ms. Brito accepted Major's offer of services through her silence, because she came to know "the terms on which the services [were] offered, receive[d] the benefit of the services, and [did] not reject the offer despite having a reasonable opportunity to do so." *Id.*

Moreover, the cases cited by plaintiff, referenced earlier, do not lead to a different conclusion.  The Supreme Court has made clear that issues of contract formation are generally for courts, not arbitrators, to decide.  *See Granite Rock*, 561 U.S. at 296; *see also Berkeley Cty. Sch. Dist.*, 944 F.3d at 234.

In sum, the determination that a contract was formed is supported by application of principles Maryland contract law.  Therefore, it follows that plaintiff is bound by the arbitration clause.

Having determined that two elements required for application of the FAA are satisfied, there remain two more to address.  The third element requires that the transaction, as evidenced by an arbitration agreement, have a relationship to interstate or foreign commerce. *See Galloway*, 819 F.3d at 84.  And, the fourth element requires that the target of a motion brought under the FAA has failed, neglected, or refused to arbitrate the dispute.  *See id.*  Both remaining elements are plainly satisfied here: the third because plaintiff has filed suit on behalf of a putative nationwide class, where it is undisputed that Major supplies residential electricity in multiple states; and, the fourth because plaintiff has filed suit in this Court, rather than proceeding through arbitration. Accordingly, all elements required for application of the FAA are satisfied.

The final question concerns whether to stay or dismiss the suit.  Major asks for a stay or dismissal, but points the Court toward dismissal, contending that all of plaintiff's claims are arbitrable.  ECF 22-1 at 19.  Ordinarily, the "'proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings pending arbitration,'" under Section 3 of the FAA, "'rather than to dismiss outright.'"  *Aggaro v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 376 n. 18 (4th Cir. 2012).  However, Fourth Circuit case law indicates that dismissal, rather than a stay, may be "a proper remedy when *all* of the issues presented in a lawsuit are arbitrable."  *Choice Hotels Int'l*, 252 F.3d at 709-10 (emphasis added); *see also Aggaro*, 675 F.3d at 376 n.18 (discussing *Choice Hotels* and status of circuit split as to "whether a district court has discretion to dismiss rather than stay an action subject to arbitration").

As Judge Chasnow noted in *Taylor v. Santander Consumer USA, Inc.*, DKC-15-0442, 2015 WL 5178018, at *7 (D. Md. Sept 3, 2015), despite the "disagreement within the Fourth Circuit as to [whether] dismissal is appropriate, . . . district courts within the Fourth Circuit have continued to find dismissal appropriate."  *See, e.g.*, *Willcock*, 2018 WL 3970474, at *5; *Garrett*, 2018 WL

3579856, at *4 ("The FAA requires a district court to stay judicial proceedings involving issues covered by arbitration agreements.  Dismissal is also a proper remedy under the circumstances." (citation omitted)); *Bracey v. Lancaster Foods, LLC*, RDB-17-1826, 2018 WL 1570239, at *7 (D. Md. Mar. 30, 2018) ("Having determined that Bracey is bound by the Arbitration claims.")  (citing *Choice Hotels*)); *Washington v. Lennar Corp.*, TDC-17-0079, 2018 WL 722418, at *3 (D. Md. Feb. 5, 2018) ("While the FAA further requires only that this Court stay the proceedings pending that arbitration, 'dismissal is prober when all of the issues presented in a lawsuit are arbitrable.' *Choice Hotels* . . . .  Here, all of Washington's claims against Lennar are within the scope of the parties' arbitration clause.  The Court will thus dismiss Washington's claims.").

Each count of the Amended Complaint falls within the scope of the Agreement's arbitration clause, which states that "[a]ny claim by customer," except for one challenging the validity or enforceability of the arbitration clause, "must be resolved by the PSC or arbitration."  ECF 21-2 at 11, ¶ 14.  Accordingly, I shall dismiss plaintiff's suit.  And, I need not address the parties' arguments regarding exhaustion of administrative remedies or the sufficiency of plaintiff's claims.

## IV. Conclusion

For the reasons set forth above, I shall grant Major's Motion to Dismiss (ECF 21) and the FAA Motion (ECF 22), and deny plaintiff's motion for leave to file surreplies (ECF 34).  An Order follows.


Date: January 8, 2021                           /s/
                                    Ellen L. Hollander
                                    United States District Judge